**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Ely, | No. CV-18-0557-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew M. Saul,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Combined Opening Brief and Motion for Class Certification; Memorandum of Points and Authorities ("Opening Brief") (Doc. 26). Defendant filed his Combined Brief on the Merits and in Opposition to Class Certification Brief ("Response") (Doc. 38), and Plaintiff filed his Reply (Doc. 39). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). *See* Pl.'s First Amended Class Action Compl. for Decl., Injunctive, and Other Relief (Doc. 18). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

---

[1] The Court takes judicial notice that Nancy A. Berryhill is no longer Acting Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Commissioner of the SSA, Thomas M. Saul, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* Fed. R. App. P. 43(c)(2).

## I.   BACKGROUND

### A.   *Procedural History*

On August 5, 2015, Plaintiff filed an application for spouse's benefits.   *See* Administrative Record ("AR") at 10, 28, 182.   The Social Security Administration ("SSA") denied this application on October 6, 2015.   *Id.* at 24–26, 182.   On October 23, 2015, Plaintiff filed a request for reconsideration, and on November 4, 2015, SSA denied Plaintiff's application upon reconsideration.   *Id.* at 27–35, 182.   On December 2, 2015, Plaintiff filed his request for hearing.   *Id.* at 36–37, 66–67.   On May 10, 2017, a hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens.   *Id.* at 185–96. On October 17, 2017, the ALJ issued an unfavorable decision.   AR at 179–84.   The ALJ's denial of Plaintiff's claims was based on Plaintiff and his husband's marriage not meeting the durational requirements.   *Id.* at 183–84.   On December 14, 2017, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on September 26, 2018, review was denied.   *Id.* at 3–6, 170–78.   On November 20, 2018, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B.   *Factual History*

#### 1.   <u>Michael Ely and James Taylor</u>

Plaintiff Michael Ely and his husband James A. Taylor ("Spider") were committed to one another for forty-three (43) years.   AR at 88.   The met in 1971 in a Sunset Beach, California bar when Spider asked Michael to dance.   *Id.*   Mr. Ely remembers realizing that night that he "had met [his] soul mate."   *Id.*   Mr. Ely and Mr. Taylor fell in love and began living together on December 5, 1971 and celebrated that date as their anniversary until their marriage in November 2014.   *Id.*

When they met, Mr. Taylor played guitar in a band called Emperor.   *Id.*   After approximately a decade of watching performances, Mr. Ely became involved as a lyricist and singer.   AR at 88.   During this time, California was their home; however, the AIDS epidemic and its resulting losses caused Mr. Ely and Mr. Taylor to relocate to Arizona in the early 1990s.   *Id.* at 89.   Mr. Taylor had family in Northern Arizona and when the pair

1   visited Tucson, they knew they had found their home.  *Id.*

2          After their move, Mr. Taylor kept his job with Boeing in California and commuted

3   for approximately eight (8) months, spending weekends with Mr. Ely in Arizona, while

4   searching for a job locally.  *Id.*  Mr. Taylor ultimately found a job as a structure mechanic

5   working on jet airplanes with Bombardier.  *Id.*  Mr. Taylor was the breadwinner and Mr.

6   Ely was the homemaker.  AR at 90.  As with many traditional households, Mr. Taylor

7   worked outside of the home, and Mr. Ely was responsible for maintaining their home—

8   including doing the cooking, cleaning, laundry, banking, and paying bills.  *Id.*  Mr. Taylor

9   would take care of any necessary repairs.  *Id.*  Together they adopted a dog and had a joint

10  bank account.  *Id.*

11         Although Mr. Ely and Mr. Taylor first started talking about marriage in 1973, Mr.

12  Ely did not believe that they would ever be allowed to until quite recently.  *Id.* at 91.  At

13  some point during the seventies, Mr. Taylor was hospitalized with pneumonia, and Mr. Ely

14  was prohibited from seeing him more than one (1) hour per day because he was not deemed

15  "family."  AR at 91.  For many years, marriage did not seem attainable.  *Id.* at 92.  During

16  that time, Mr. Ely and Mr. Taylor decided to have a commitment ceremony, so they could

17  have rings signifying their relationship.  *Id.* at 93.  On December 5, 2007, thirty-six (36)

18  years after they began living together, Mr. Ely and Mr. Taylor had a commitment ceremony

19  with their friend Cindy as the celebrant.  *Id.*  The couple jumped over a broom, a ritual that

20  Mr. Ely linked back to slavery when slaves were not permitted to marry, and exchanged

21  rings.  *Id.*

22         When California began allowing same-sex marriage, friends encouraged Mr. Ely

23  and Mr. Taylor to travel to California to get married.  AR at 92.  Arizona, however, still

24  prohibited same-sex marriage, and the couple felt it would be pointless to marry in

25  California only for the union to be ignored by their home state.  *Id.*  Mr. Ely and Mr. Taylor

26  also did not have a lot of money, so travelling to California or Canada for a marriage that

27  was invalid at home was too costly.  *Id.*  Mr. Ely and Mr. Taylor did make efforts to

28  demonstrate their commitment to one another in more attainable ways.  On standardized

forms which required checking a box for relationship, there was usually not a box for "significant other," so they would create their own box, labeling it "gay couple" or "domestic partners." *Id.* Mr. Ely would still be labeled "single" because they were not married and their relationship did not fit the predefined choices. AR at 92. They also wore the rings that they exchanged at their commitment ceremony as a symbol of their love. *Id.* at 94.

In November 2013, Mr. Taylor was diagnosed with cancer. *Id.* at 93. He had multiple tumors—too many to qualify for a transplant. *Id.* And yet he held on to the hope that he would receive one. *Id.* Mr. Ely found his world unraveling overnight, including the fear of losing his beloved, the need to sell their home and belongings to move into a smaller space, and Mr. Taylor undergoing treatment. AR at 94. In 2014, Mr. Ely and Mr. Taylor were finally able to marry in Arizona. *Id.* At this point, they had been together for forty-three (43) years. On November 17, 2014, they went to the Pima County Superior Court and were wed, exchanging the same rings that they had given one another at their commitment ceremony. *Id.* Only eight (8) of their closest friends attended the ceremony, but a reception and big party followed at their friend Cindy's home. *Id.* Mr. Ely was finally able to check the "married" box. *Id.* at 92.

Sadly, six months later, Mr. Ely was checking the "widow" box. AR at 92. Despite his best effort, Mr. Taylor did not live to see their first anniversary. *Id.* at 95. Mr. Taylor stopped working in January 2014 due to his cancer. *Id.* Once Mr. Ely and Mr. Taylor were married, they worked to put their home and later the townhouse in both of their names, and subsequently put everything in Mr. Ely's name alone. *Id.* During Mr. Taylor's illness, Mr. Ely would care for him. *Id.* at 94. Mr. Ely described Mr. Taylor as not having a fear of dying, but rather being concerned about Mr. Ely's well-being after his death. AR at 95.

### 2.  Putative Class Members

#### a.  James Obergefell, surviving spouse of John Arthur

The story of Mr. Obergefell and his husband, John Arthur, was previously outlined by the Supreme Court of the United States. *Obergefell v. Hodges*, — U.S. —, 135 S. Ct.

2584, 2594–95, 192 L. Ed. 2d 609 (2015).  Mr. Obergefell and Mr. Arthur met shortly after Mr. Obergefell graduated from college.  Pl.'s Opening Br. (Doc. 26), Obergefell Decl. (Doc. 26-2) at ¶¶ 2–4.  They quickly built a life together—both were information technology professionals, they shared a home and extended family, and were involved in their community and charitable causes.  *Id.* at ¶¶ 4–6.  Tragically, Mr. Arthur was diagnosed with Amyotrophic Lateral Sclerosis ("ALS") at the age of forty-five (45).  *Id.* at ¶ 7.  In preparation for Mr. Arthur's reduced mobility, they bought a condominium which could accommodate a wheelchair.  *Id.* at ¶ 9.  This was the third home that Mr. Arthur and Mr. Obergefell had purchased in their twenty (20) years together, but the final deed was in Mr. Obergefell's name only; Mr. Arthur hoped to simplify Mr. Obergefell's life after he was gone.  Pl.'s Opening Br. (Doc. 26), Obergefell Decl. (Doc. 26-2) at ¶ 9.

Despite Mr. Arthur and Mr. Obergefell's long commitment to one another, and although their friends and family considered them a married couple, federal and state law did not recognize their relationship.  *Id.* at ¶ 18.  When the Supreme Court of the United States issued its decision in *United States v. Windsor*,[2] Mr. Obergefell and Mr. Arthur decided to marry.  *Id.* at ¶ 17.  Prior to the *Windsor* decision, they had chosen only to marry if the ceremony carried legal weight; with *Windsor*, the recognition of same-sex marriages seemed on the horizon.  *Id.*  Mr. Obergefell researched where they might be married, but due to Mr. Arthur's deteriorated health, the couple was restricted to states in which only one partner had to apply for the marriage license in person.  Pl.'s Opening Br. (Doc. 26), Obergefell Decl. (Doc. 26-2) at ¶ 19.  On July 11, 2013, with the fundraising and assistance of friends and family, Mr. Obergefell and Mr. Arthur wed in an airplane on the tarmac of the Baltimore, Maryland airport.  *Id.* at 20–21.  Subsequently, Mr. Obergefell and Mr. Arthur sought a temporary restraining order ("TRO") requesting that the state of Ohio be required to recognize their marriage so that Mr. Obergefell could be listed as Mr. Arthur's husband on the latter's death certificate.  *Id.* at ¶ 22.  After their marriage, Mr. Obergefell sought leave from his employer to care for Mr. Arthur, but his request was denied because

---

[2] 570 U.S. 744, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013).

1  Ohio did not recognize their marriage. *Id.* at ¶ 28.

2         On October 22, 2013, Mr. Arthur died, twenty (20) years, nine (9) months and

3  twenty-two (22) days after he and Mr. Obergefell fell in love. *Id.* at ¶ 29. Mr. Obergefell

4  did not qualify for a lump-sum death benefit from the Social Security Administration

5  because he and Mr. Arthur were not legally married under the laws of Ohio. Pl.'s Opening

6  Br. (Doc. 26), Obergefell Decl. (Doc. 26-2) at ¶ 31. Mr. Obergefell and Mr. Arthur were

7  married for approximately three (3) months before Mr. Arthur's passing. *Id.*

8                    **b. Anthony Gonzales, surviving spouse of Mark Johnson**

9         Anthony Gonzales and Mark Johnson met in July of 1998 when they were both in

10  their early forties. Pl.'s Opening Br. (Doc. 26), Gonzales Decl. (Doc. 26-3) at ¶ 3. Mr.

11  Gonzales worked as an accountant for a non-profit organization and Mr. Johnson was in

12  the midst of a career change which would lead him to become a teacher. *Id.* at ¶ 4–5. Mr.

13  Gonzales and Mr. Johnson shared many of the same interests, and by November 1998 they

14  were searching for their first home. *Id.* at ¶ 6–7. Together they chose a home to purchase

15  and moved in on December 7, 1998. *Id.* at ¶ 7. Mr. Gonzales and Mr. Johnson built a life

16  together, including a family of two (2) cats and eventually two (2) cocker spaniels. *Id.* at

17  ¶ 8. Although unable to marry, Mr. Gonzales and Mr. Johnson's life together including

18  opening a joint checking account from which they paid their mortgage and other household

19  expenses, working on their home, and traveling. Pl.'s Opening Br. (Doc. 26), Gonzales

20  Decl. (Doc. 26-3) at ¶ 9. Mr. Johnson developed a close relationship to Mr. Gonzales's

21  family, especially his mother. *Id.* at ¶ 10.

22         In 2011, Mr. Johnson was diagnosed with cancer. *Id.* at ¶ 12. He underwent

23  radiation treatment and was in remission until early 2013. *Id.* at 13. Mr. Johnson

24  subsequently underwent chemotherapy treatment and Mr. Gonzales was his caretaker

25  while continuing his work as an accountant. Pl.'s Opening Br. (Doc. 26), Gonzales Decl.

26  (Doc. 26-3) at ¶ 17–18. That summer, same-sex marriage became an issue in New Mexico.

27  *Id.* at ¶ 19. Mr. Johnson and Mr. Gonzales had talked about getting married, but they did

28  not want to marry out-of-state, away from family and friends, only to return home and have

their bond unrecognized. *Id.* at ¶ 20. Mr. Johnson expressed his desire to get married when the Las Cruces and Santa Fe clerks began issuing marriage licenses to same-sex couples; however, he was not in a condition to make the drive and Mr. Gonzales counseled for patience. *Id.* at ¶ 21–22. On August 26, 2013, the county clerk of Bernalillo County, where Mr. Gonzales and Mr. Johnson lived, informed Mr. Gonzales that the clerk's office would start issuing licenses the following day. *Id.* at ¶ 23. The next day, Mr. Gonzales and Mr. Johnson went to the clerk's office and obtained their marriage license. Pl.'s Opening Br. (Doc. 26), Gonzales Decl. (Doc. 26-3) at ¶ 24–26. It was announced that a mass marriage ceremony was to occur in the Civic Plaza adjacent to the county building and the two were wed that day. *Id.* at ¶ 27–28. In December 2013, the New Mexico Supreme Court issued its opinion that the ban on same-sex marriage was unconstitutional. *Id.* at ¶ 29.

Mr. Johnson's cancer treatment continued, as did Mr. Gonzales's role of caregiver. *Id.* at ¶ 30–38. Mr. Johnson's health declined precipitously in 2014 and he passed away on February 19, 2014. *Id.* at ¶ 34–39. In January 2015, Mr. Gonzales lost his job due to a reorganization and applied for social security survivor's benefits when he turned sixty (60) in May of that year. Pl.'s Opening Br. (Doc. 26), Gonzales Decl. (Doc. 26-3) at ¶ 41–42. Mr. Gonzales's application was denied because he and Mr. Johnson had not been married the requisite nine (9) months. *Id.* at ¶ 43.

## II.   STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). "'[E]ven when the ALJ commits legal error, we uphold the decision where that error is

harmless,' meaning that 'it is inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'"  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (citing *Treichler*, 775 F.3d at 1099).

## III.   MERITS ANALYSIS

Plaintiff seeks review of Defendant's denial of his application for survivor's benefits "based on his inability to satisfy the nine-month marriage duration requirement for such benefits."  Pl.'s Opening Br. (Doc. 26) at 12.  Plaintiff asserts that this denial violates his constitutional rights of equal protection and due process.  *Id.*  The Social Security Act provides widow's and widower's insurance benefits (collectively "survivor's benefits") to surviving spouses.  42 U.S.C. §§ 402(e)–(f) (widow's and widower's insurance benefits respectively).  These provisions allow a surviving spouse to collect a monthly stipend based on the wages and self-employment income of their deceased spouse.  *See id.*[3]  A surviving

---

[3] Section 402(f), Widower's insurance benefits, provides in relevant part:

(1) The widower (as defined in section 416(g) of this title) and every surviving divorced husband (as defined in section 416(d) of this title) of an individual who died a fully insured individual, if such widower or such surviving divorced husband—

(A) is not married,

(B) (i) has attained age 60, or (ii) has attained age 50 but has not attained age 60 and is under a disability (as defined in section 423(d) of this title) which began before the end of the period specified in paragraph (4),

(C) (i) has filed application for widower's insurance benefits,

(ii) was entitled to husband's insurance benefits, on the basis of the wages and self-employment income of such individual, for the month preceding the month in which such individual died, and—

(I)  has attained retirement age (as defined in section 416(l) of this title),

(II) is not entitled to benefits under subsection (a) or section 423 of this title, or

(III) has in effect a certificate (described in paragraph (8)) filed by him with the Commissioner of Social Security, in accordance with regulations

spouse is entitled to benefits beginning at the age of sixty (60).  42 U.S.C. § 402(f)(1)(B)(i).  Subject to various exceptions, a couple must have been married for "a period of not less than nine months" in order for a surviving spouse to qualify for benefits.  42 U.S.C. 416(g); *see also* 20 C.F.R. § 404.335(a)(1).[4]

. . .

---

prescribed by the Commissioner of Social Security, in which he elects to receive widower's insurance benefits (subject to reduction as provided in subsection (q)), or

(iii) was entitled, on the basis of such wages and self-employment income, to father's insurance benefits for the month preceding the month in which he attained retirement age (as defined in section 416(l) of this title), and

(D) is not entitled to old-age insurance benefits, or is entitled to old-age insurance benefits each of which is less that the primary insurance amount (as determined after application of subparagraphs (B) and (C) of paragraph (3)) of such deceased individual,

shall be entitled to widower's insurance benefit for each month[.]

42 U.S.C. § 402(f).

[4] Section 416(g), United States Code, Title 42 defines the term "Widower" for purposes of the Social Security Act.  It provides in relevant part:

The term "widower' (except when used in the first sentence of section 402(i) of this title) means the surviving husband of an individual, but only if (A) he is the father of her son or daughter, (B) he legally adopted her son or daughter while he was married to her and while such son or daughter was under the age of eighteen, (C) she legally adopted his son or daughter while he was married to her and while such son or daughter was under the age of eighteen, (D) he was married to her at the time both of them legally adopted a child under the age of eighteen, **(E) except as provided in paragraph (2), he was married to her for a period of not less than nine months immediately prior to the day on which she died,** or (F) in the month before the month of his marriage to her (i) he was entitled to, or on application therefor and attainment of age 62 in such prior month would have been entitled to benefits under subsection (c),(f), or (h) of section 402 of this title, (ii) he had attained age eighteen and was entitled to, or on application therefor would have been entitled to benefits under subsection (d) of such section (subject, however, to section 402(s) of this title), or (iii) he was entitled to, or on application therefor and attainment of the required age (if any) he would have been entitled to, a widower's, child's, (after attainment of age 18), or parent's insurance annuity under section 231a of Title 45.

42 U.S.C. § 416(g)(1) (emphasis added).

### A.     Statutory Background

"The danger of persons entering a marriage relationship not to enjoy its traditional benefits, but instead to enable one spouse to claim benefits upon the anticipated early death of the wage earner, has been recognized from the very beginning of the Social Security program." *Weinberger v. Salfi*, 422 U.S. 749, 777, 95 S. Ct. 2457, 2473, 45 L. Ed. 2d 522 (1975).   Regarding Section 402(e) widow's benefits, the Advisory Council on Social Security stated, "As in the case of wives' allowances, it is believed desirable to protect the provisions for widows' benefits against abuse by the requirement of a minimum period of marital status." *Id.* at 778, 95 S. Ct. at 2473 (citations and quotations omitted).   The initial durational requirement was five (5) years, which was reduced to three (3) years in 1946, then one (1) year, and finally to its current nine (9) months.  *Id.* at 777–80, 95 S. Ct. at 2473–74; *see also* Soc. Sec. Amendments of 1967, Pub. L. No. 90-248 § 156, 81 Stat. 821, 866 (1968).  During a modification to the exceptions from the nine (9) month requirement, "the House Report observed: 'This duration-of-relationship requirement is included in the law as a general precaution against the payment of benefits where the marriage was undertaken to secure benefit rights.'"  *Id.* at 780, 95 S. Ct. at 2474 (citing H.R. Rep. No. 92–231, p. 55 (1971); U.S. Code Cong. & Admin. News 1972, p. 5042).

Exceptions to the nine-month durational requirement include accidental death, death in the line of duty of an active duty serviceperson, or where a couple had been previously married for nine (9) months or more prior to their first divorce.  42 U.S.C. § 416(k).  The durational requirement is also deemed satisfied where: "(A) the individual had been married prior to the individual's marriage to the surviving husband, (B) the prior husband was institutionalized during the individual's marriage to the prior husband due to mental incompetence or similar incapacity, (C) during the period of the prior husband's institutionalization, the individual would have divorced the prior husband and married the surviving husband, but the individual did not do so because such divorce would have been unlawful, by reason of the prior husband's institutionalization, under the laws of the State in which the individual was domiciled at the time (as determined based on evidence

satisfactory to the Commissioner of Social Security), (D) the prior husband continued to remain institutionalized up to the time of his death, and (E) the individual married the surviving husband within 60 days after the prior husband's death." 42 U.S.C. § 416(g)(2).

The Social Security Act contains gendered language; however, since the Supreme Court of the United States' decision in *Windsor*,[5] the Act applies to both opposite and same-sex couples. In *Windsor*, the Court considered the constitutionality of section 3 of the Defense of Marriage Act ("DOMA") which excluded "same-sex partner[s] from the definition of 'spouse' as that term [wa]s used in federal statutes." *United States v. Windsor*, 570 U.S. 744, 751–52, 133 S. Ct. 2675, 2682–83, 186 L. Ed. 2d 808 (2013). DOMA defined marriage as "a legal union between one man and one woman as husband and wife, and the word 'spouse' refer[red] only to a person of the opposite sex who is a husband or a wife." *Id.* at 752, 133 S. Ct. at 2683 (citing 1 U.S.C. § 7). The Court observed:

> The definitional provision does not by its terms forbid States from enacting laws permitting same-sex marriages or civil unions or providing state benefits to residents in that status. The enactment's comprehensive definition of marriage for purposes of all federal statues and other regulations or directives covered by its terms, however, does control over 1,000 federal laws in which marital or spousal status is addressed as a matter of federal law.

*Id.* The Court recognized that "the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." *Id.* at 767, 133 S. Ct. at 2691. The Court further observed that when the State of New York decided to give the "class of persons [comprised of same-sex couples] the right to marry [and] conferred upon them a dignity and status of immense import[;] . . . the State used its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community[,] but DOMA, because of its reach and extent, depart[ed] from this history and tradition of reliance on state law to define marriage." *Id.* at 768, 133 S. Ct. at 2692. The Court found that "DOMA s[ought] to injure the very class New York s[ought] to protect[,]

---

[5] *United States v. Windsor*, 570 U.S. 744, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013).

[and] [b]y doing so it violate[d] basic due process and equal protection principles applicable to the Federal Government." *Id.* at 769, 133 S. Ct. at 2693 (citing U.S. Const., Amend. 5; then citing *Bolling v. Sharpe*, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954)).

On June 20, 2014, Attorney General Eric Holder reported to President Obama "that agencies across the federal government have implemented the *Windsor* decision to treat married same-sex couples the same as married opposite-sex couples for the benefits and obligations for which marriage is relevant, to the greatest extent possible under the law." AR at 131.  Although many federal agencies adopted the "place of celebration" rule which acknowledges marriages as valid where they occurred, AG Holder noted that "[t]he Social Security Administration . . . [is] required by law to confer certain marriage-related benefits based on the law of the state in which the married couple resides or resided, preventing the extension of benefits to same-sex married couples living in states that do not allow or recognize same-sex marriages." *Id.* at 133.  As such, SSA's implementation of *Windsor* regarding processing surviving spouses' claims depended upon whether "the individual who paid into social security was domiciled at the time of his or her death in a state the recognized his or her marriage." *Id.* at 146.

## B.  Level of Scrutiny: Facial Neutrality and State Law

The Parties disagree regarding the appropriate level of scrutiny to apply when analyzing the marriage duration requirement.  Plaintiff urges a heightened level of scrutiny is appropriate, while Defendant asserts that rational basis review should apply.  Pl's Opening Br. (Doc. 26) at 21–25; Pl.'s Reply (Doc. 39) at 12–16; Def.'s Response (Doc. 38) at 18–21.

Defendant asserts that "[t]he duration-of-marriage requirements in the Social Security Act's definitions of 'widow' and 'widower' apply identically to surviving spouses of same-sex and opposite-sex marriages, all of whom are generally denied benefits when their marriage was shorter than nine-months—regardless of the sexual orientation or the gender of the applicant, and regardless of the reason *why* the marriage only lasted nine

months." Def.'s Response (Doc. 38) at 17.[6]  Defendant further urges that "[b]ecause that facially neutral criteria neither targets a suspect class nor burdens a fundamental right, it is subject only to rational-basis review."  *Id.*  Defendant explains that "[t]he reason Mr. Ely was deemed not to be a 'widower'—at least for purposes of the specific statutory definition at issue here[]—was *not* because of Arizona's former state laws about marriage, nor was it because of Mr. Ely's sexual orientation or gender."  *Id.* at 28 (emphasis in original). Defendant urges that "Mr. Ely was denied benefits because the date on his spouse's death certificate was less than nine months after the date on their marriage certificate."  *Id.*

Plaintiff urges that a heightened level of scrutiny is appropriate in light of Defendant's discrimination against him based on sex and/or sexual orientation.  *See* Pl.'s Opening Br. (Doc. 26) at 21–25; Pl.'s Reply (Doc. 39) at 12–16.  Plaintiff observes that "[b]ecause it was unconstitutional to exclude [him] and Mr. Taylor from marrying in the first instance, it is also unconstitutional for the government to rely on that exclusion to exclude [Plaintiff] from survivor's benefits for which he would have otherwise been eligible."  Pl.'s Opening Br. (Doc. 26) at 16.  Plaintiff urges that "SSA's defense hinges on the fiction that its marriage duration requirement is 'neutral' as to same-sex couples who were barred from marriage for the requisite duration by discriminatory laws that the agency embraced as a condition for benefits."  Pl.'s Reply (Doc. 39) at 12.

Here, the duration of marriage requirement cannot be read in a vacuum.  The language of the Social Security Act itself requires an assessment of whether the State in which an insured individual was domiciled would find such an individual validly married at the time of death.  42 U.S.C. § 416(h)(1)(A)(i).[7]  This reliance on State law is also explicit

---

[6] Page numbers for items other than the Administrative Record reflect the CM/ECF page number.

[7] Section 416(h)(1)(A), Title 42, United States Code provides in full:

(i) An applicant is the wife, husband, widow, or widower of a fully or currently insured individual for purposes of this subchapter if the courts of the State in which such insured individual is domiciled at the time such applicant files an application, or if such insured individual is dead, the courts of the State in which he was domiciled at the time of death, or if such insured individual is or was not so

in the Social Security regulations which explain that "[t]o decide your relationship as the insured's widow or widower, we look to the laws of the State where the insured had a permanent home when he or she died. . . . If you and the insured were validly married under State law at the time . . . the insured died[,] if you apply for widow's, widower's, mother's, or father's benefits, the relationship requirement will be met." 20 C.F.R. § 404.345.  This unequivocal direction to look to State law in order to determine the validity of a marriage is counter to Defendant's contention that "the Social Security Administration relied only on the duration-of-marriage requirement, . . . it did not rely upon an unconstitutional state law[.]"  Def.'s Response (Doc. 38) at 32 (quotations and citations omitted).  The Court is "convinced that the structure and language of 42 U.S.C.A. s 42 U.S.C. § 416(h)[(1)](A) of the Social Security Act, referring to state law on [marriage], makes relevant the issue of the constitutionality of a particular state law."  *Cox v. Schweiker*, 684 F.2d 310, 317 (5th Cir. 1982).  Because the duration of marriage requirement is based upon an unconstitutional Arizona law, it cannot withstand scrutiny at any level.

## C.    *Rational Basis Review*

"The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."  *Romer v. Evans*, 317 U.S. 620, 631, 116 S. Ct. 1620, 1626 (1996) (citations omitted).  The Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, [it] will

domiciled in any State, the courts of the District of Columbia, would find that such applicant and such insured individual were validly married at the time such applicant files such application or, if such insured individual is dead, at the time he died.

(ii) if such courts would not find that such applicant and such insured individual were validly married at such time, such applicant shall, nevertheless, be deemed to be the wife, husband, widow, or widower, as the case may be, of such insured individual if such applicant would, under the laws applied by such courts in determining the devolution of intestate personal property, have the same status with respect to the taking of such property as a wife, husband, widow, or widower of such insured individual.

uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* (citations omitted). The Court recognizes "[t]he right to marry is fundamental as a matter of history and tradition[.]" *Obergefell v. Hodges*, — U.S. —, 135 S. Ct. 2584, 2602, 192 L. Ed. 2d 609 (2015). The Court observed that:

> The right of same-sex couples to marry that is part of the liberty promised by the Fourteenth Amendment is derived, too, from that amendment's guarantee of the equal protection of the laws. The Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles. Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other. In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right."

*Obergefell*, 135 S. Ct. at 2602–03. The Court further held "that the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty." *Id.* at 2604. Included in the panoply of governmental rights, benefits, and responsibilities that marital status confers are the rights and benefits of survivors. *Id.* at 2601. Because same-sex marriage is a fundamental right, and the underpinnings of the duration-of-marriage requirement has relied on the unconstitutional ban of that right, it cannot be said to be rationally related to a legitimate interest as to a surviving spouse such as Mr. Ely.

Defendant relies heavily on the Supreme Court's decision in *Weinberger v. Salfi* upholding the duration-of-marriage requirement upon rational basis review. 422 U.S. 749, 95 S. Ct. 2457, 45 L. Ed. 2d 522 (1975). Unlike Mr. Ely, however, Mrs. Salfi was not unconstitutionally barred from marrying Mr. Salfi prior to their union. *See id.*; *see also Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (recognizing that unlike their same-sex counterparts, opposite-sex couples who "wish[ed] to retain their current family health benefits could alter their status—marry—to do so") If Mr. Ely and Mr. Taylor had been legally able to marry nine (9) months prior to Mr. Taylor's death this might be a different

case; however, they were not.  The unconstitutional infringement on Mr. Ely and Mr. Taylor's fundamental right to marriage is now being perpetuated further by the denial of Mr. Ely to obtain survivor's benefits.  For married couples, such as Mr. Ely and Mr. Taylor, who could not meet the durational requirement due to the same-sex marriage ban in their home state, Defendant's decision has "denied [these] married same-sex couples access to the 'constellation of benefits that the Stat[e] ha[s] linked to marriage." *Pavan v. Smith*, — U.S. —, 137 S. Ct. 2075, 2078, 198 L. Ed. 2d 636 (2017) (citing *Obergefell*, 135 S. Ct. at 2601) (first alteration added, subsequent alterations in original).  In light of Defendant's reliance on an unconstitutional law underlying the duration-of-marriage requirement, the Social Security Administration cannot be said to be acting in furtherance of a legitimate state interest.  *See Diaz*, 656 F.3d at 1015 (citations omitted) ("some objectives, such as a 'bare . . . desire to harm a politically unpopular group,' are not legitimate state interests.").

Similarly, "administrative efficacy" cannot be said to justify the nine-month duration-of-marriage requirement in this case.  "[A]lthough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'" *Frontiero v. Richardson*, 411 U.S. 677, 690, 93 S. Ct. 1764, 1772, 36 L. Ed. 2d 583 (1973) (quoting *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S. Ct. 1208, 1215, 31 L. Ed. 2d 551 (1972)).  Reliance on the efficiency of a statute that impermissibly denies same-sex survivor benefits to Mr. Ely "disdains present realities in deference to past formalities, [and] . . . needlessly risks running roughshod over the important interests" of avoiding ongoing discrimination.  *Stanley*, 405 U.S. at 657, 92 S. Ct. at 1215.  Furthermore, as the court recently found in *Thornton v. Commissioner of Social Security*:

> [T]he Administration is clearly capable of making these case-by-case determinations and does so in every claim it processes.  It already has regulations in place to make individualized determinations regarding benefits for people in common-law marriages.  *See* 20 C.F.R. § 404.726.  Indeed, the Administration is equipped with [a] myriad [of] internal policies for making the exact factual determinations required to determine whether [Plaintiff] and others similarly situated would have married their partner but for the

1
2
3
4
5

unconstitutional state law.  It recognizes exceptions to the nine-month marriage requirement under certain circumstances when the claimant had "a good faith belief" that the marriage was valid, but the wedding ceremony was flawed for some technical reason.  *See* 42 U.S.C. § 416(h)(1)(B)(i).  It also waives the nine-month marriage requirement when state law prevented a claimant from marrying the insured deceased spouse sooner because of a former spouse's institutionalization.  *See* 42 U.S.C. § 416(c)(2), (g)(2).

6
7
8
9

Pl.'s Not. of Suppl. Authority (Doc. 40), *Thornton v. Comm'r of SSA*, Case No. CV-18-01409-JLR-JRC, Report and Recommendation at 18 (W.D. Wash. Jan. 31, 2020).  In light of the foregoing, as to Mr. Ely, individually, the Court finds that he is entitled to survivor benefits.

10

11

**IV.    CLASS CERTIFICATION AND NATIONWIDE INJUNCTIVE RELIEF**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Plaintiff  seeks certification of a class pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure, and "agency-wide relief enjoining SSA from categorically denying survivor's benefits to all of these individuals[, who were denied survivor's benefits because of unconstitutional marriage bans,] and thereby affording them an equal opportunity to show their entitlement to such benefits."  Pl.'s Opening Br. (Doc. 26) at 33–36.  Plaintiff proposes a class defined as: "All persons nationwide who (i) presented claims for and were denied, or will present claims for and be denied, social security spousal survivor's benefits based on not being married to a same-sex spouse for at least nine months at the time of the spouse's death and (ii) were barred from being married for at least nine months by unconstitutional laws prohibiting same-sex couples from marriage."[8]  *Id.* at 34–35.  Defendant opposes class certification and urges that if the Court is to find in favor of Mr. Ely, any relief should be limited to his individual claim.  Def.'s Response (Doc. 38) at 34.  Defendant also objects to the class definition because the grammar and syntax of clause (ii) is open to interpretation and even if the ambiguity is resolved, there are questions of fact that would require "mini-trials" to determine whether an individual has a claim.  *Id.* at

27

28

---

[8] This class does not include members of the proposed class in *Thornton v. Social Security Administration*, No. CV-18-01409-JLR-JRC, (W.D. Wash.

37–39.

### A.   Jurisdiction

"Section 405(g) specifies the following requirements for judicial review: (1) a final decision of the Secretary made after a hearing; (2) commencement of a civil action within 60 days after the mailing of notice of such decision (or within such further time as the Secretary may allow); and (3) filing of the action in an appropriate district court, in general that of the plaintiff's residence or principal place of business." *Weinberger v. Salfi*, 422 U.S. 749, 763–64, 95 S. Ct. 2457, 2466, 45 L. Ed. 2d 522 (1975). "The second and third of these requirements specify, respectively, a statute of limitations and appropriate venue[,] [and] [a]s such, they are waivable[.]" *Id.* at 764, 95 S. Ct. at 2466. The Supreme Court has "interpret[ed] the first requirement, however, to be central to the requisite grant of subject-matter jurisdiction—the statute empowers district courts to review a particular type of decision by the Secretary, that type being those which are 'final' and 'made after a hearing.'" *Id.*; *see also Smith v. Berryhill*, 139 S. Ct. 1765, 204 L. Ed. 2d 62 (2019) (recognizing the requirement that claims be presented to the agency as jurisdictional). "[C]lass relief is consistent with the need for case-by-case adjudication emphasized by the Secretary, at least so long as the membership of the class is limited to those who meet the requirements of [42 U.S.C. § 405(g)]." *Califano v. Yamasaki*, 442 U.S. 682, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979). Such class relief includes the power to issue injunctive relief. *Id.* at 705, 99 S. Ct. at 2559–60.

### 1. **Presentment**

It is well-established that class members who have not "even filed an application with the Secretary, much less that he has rendered any decision, final or otherwise, review of which is sought . . . cannot satisfy the requirements for jurisdiction under 42 U.S.C. s 405(g)." *Weinberger v. Salfi*, 422 U.S. 749, 764, 95 S. Ct. 2457, 2466, 45 L. Ed. 2d 522; *see also id.* at 758 n.6 ("The entitlement sections of the Act specify the filing of an application as a prerequisite to entitlement, so a court could not in any event award benefits absent an application."). As such, the Supreme Court in *Salfi*, as to those class members

who had not yet presented their claims to the Secretary, held that "[o]ther sources of jurisdiction being foreclosed by s 405(h), the District Court was without jurisdiction over so much of the complaint as concerns the class, and it should have entered by appropriate order of dismissal." *Salfi*, 422 U.S. at 764, 95 S. Ct. at 2466.   Plaintiff's reliance on *Matthews v. Eldridge* is misplaced because "Eldridge ha[d] fulfilled this crucial prerequisite" of presentment. *Matthews v. Eldridge*, 424 U.S. 319, 329, 96 S. Ct. 893, 900, 47 L. Ed. 2d 18 (1976).   Although he had failed to raise his constitutional claim, "he specifically presented the claim that his benefits should not be terminated because he was still disabled." *Id.*

As such, for those class members who have not yet presented claims, this Court lacks jurisdiction pursuant to Section 405(g), Title 42, United States Code.

## 2.  **Exhaustion**

As noted, *supra*, administrative exhaustion is a nonjurisdictional requirement for judicial review. *See Smith v. Berryhill*, 139 S. Ct. 1765, 1773, 204 L. Ed. 2d 62 (2019). "While § 405(g) delegates to the SSA the authority to dictate which steps are generally required . . . exhaustion of those steps may not only be waived by the agency, . . . but also excused by the courts[.]" *Id.* at 1773–74 (citations omitted).   The Ninth Circuit Court of Appeals has applied "a three-part test to determine whether a particular case merits judicial waiver of the exhaustion requirement." *Johnson v. Shalala*, 2 F.3d 918, 921 (9th Cir. 1993) (citations omitted).   This test requires that the claim is "(1) collateral to a substantive claim of entitlement (collaterality), (2) colorable in its showing that denial of relief will cause irreparable harm (irreparability), and (3) one whose resolution would not serve the purposes of exhaustion (futility)." *Id.* (citations omitted).   "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S. Ct. 2457, 2467, 45 L. Ed. 2d 522 (1975).

1    The Agency has not waived the exhaustion requirement and urges this Court not to

2    excuse it.  Def.'s Response (Doc. 38) at 36; Def.'s Answer to Amended Compl. (Doc. 20)

3    at 10.  Defendant urges that the claims are highly fact-specific and such an "inquiry cannot

4    be resolved by this Court *en masse*[,] . . . [which] cries out for individualized adjudication

5    before Social Security Administration ALJs . . . [and] that the exhaustion requirement is

6    designed for[.]"  Def.'s Response (Doc. 38) at 36.

7        Plaintiff, however, seeks "the invalidation of a rule used to determine eligibility for

8    benefits rather than the denial of benefits in a particular case."  *Johnson*, 2 F.3d at 921.

9    The "challenge to the policy rises and falls on its own, separate from the merits of [a] claim

10   for benefits."  *Id.* at 921–22.  As such, "[t]he plaintiff['s] claim is collateral because it is

11   not bound up with the merits so closely that [the court's] decision would constitute

12   interference with agency process."  *Johnson*, 2 F.3d at 922 (quotations and citations

13   omitted) (third alteration in original).  Once the "only issue is the constitutionality of a

14   statutory requirement, a matter which is beyond [the Secretary's] jurisdiction to determine,

15   . . . further exhaustion would not merely be futile for the applicant, but would also be a

16   commitment of administrative resources unsupported by any administrative or judicial

17   interest."  *Salfi*, 422 U.S. at 765–66, 95 S. Ct. at 2647.

18       As the *Thornton* court observed, "[w]hile each case may present unique questions

19   regarding whether or not any particular claimant would have been married [for nine months

20   or more] to his or her deceased partner but for their state's law prohibiting such a marriage,

21   answering those unique questions is not determinative of the constitutional issue presented

22   to this court."  Pl.'s Not. of Suppl. Authority (Doc. 40), *Thornton v. Comm'r of SSA*, Case

23   No. CV-18-01409-JLR-JRC, Report and Recommendation at 25 (W.D. Wash. Jan. 31,

24   2020).  Furthermore, "although the Administration is uniquely qualified to make these

25   factual, case-by-case determinations, it has chosen not to do so because of its policy not to

26   consider such claims."  *Id.*  In such a circumstance, pursuing exhaustion of administrative

27   remedies would be futile.  *See Salfi*, 422 U.S. at 765–66, 95 S. Ct. at 2647.

28       Based on the foregoing, the Court finds that inclusion of individuals who have not

1   yet exhausted their claims in the class is appropriate.[9]

2   ### 3.  Sixty Day Statute of Limitations

3   "The requirement that a claimant appeal an adverse decision within 60 days is not

4   jurisdictional[;] [i]t is waivable by the Secretary of the courts." *Johnson v. Shalala*, 2 F.3d

5   918, 923 (9th Cir. 1993); *see also Weinberger v. Salfi*, 422 U.S. 749, 763–64, 95 S. Ct.

6   2457, 2466, 45 L. Ed. 2d 522 (1975).  The Supreme Court has recognized that equitable

7   tolling of the sixty (60) day statute of limitations is consistent with Congress' intent.

8   *Bowen v. New York*, 476 U.S. 467, 480, 106 S. Ct. 2022, 2030, 90 L. Ed. 2d 462 (1986).

9   "While in most cases the Secretary will make the determination whether it is proper to

10  extend the period within which review must be sought, cases may arise where the equities

11  in favor of tolling the limitations period are so great that deference to the agency's

12  judgment is inappropriate." *Id.* (citations omitted).

13  Here, Defendant has not waived the statute of limitations and urges that there is no

14  basis for this Court to overlook it.  Def.'s Response (Doc. 38) at 37, Def.'s Ans. to

15  Amended Compl. (Doc. 20) at 10.  The equities in this case require a tolling of the statute

16  of limitations.  As an initial matter, waiver of the exhaustion requirements, which are

17  generally a predicate to filing a case in federal courts, leads to the conclusion the sixty (60)

18  day statute of limitations should be tolled as well.  Pl.'s Not. of Suppl. Authority (Doc. 40),

19  *Thornton v. Comm'r of SSA*, Case No. CV-18-01409-JLR-JRC, Report and

20  Recommendation at 27 (W.D. Wash. Jan. 31, 2020).  Furthermore, "[a]ll of the class

21  members who permitted their administrative or judicial remedies to expire were entitled to

22  believe that their Government's determination of ineligibility was the considered judgment

23  of an agency faithfully executing the laws of the United States."  *Bowen*, 476 U.S. at 480,

24  106 S. Ct. at 2030.  This is the unusual case where Agency policy was based upon

25  unconstitutional regulations.  As such, the Court finds waiver of the sixty (60) day statute

26

27  [9] The Court also finds it appropriate to clarify that the Administration, no the Court, will
    be responsible for implementing appropriate regulations to comply with the injunction in this case.
28  *See* Pl.'s Not. of Suppl. Authority (Doc. 40), *Thornton v. Comm'r of SSA*, USDC W.D. Wash.,
    Case No. CV-18-01409-JLR-JRC, Report & Recommendation 1/31/2020 at 25.

of limitations is appropriate.

### 4. **Mandamus**

Section 1361, Title 28, United States Code, provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The Ninth Circuit Court of Appeals "has held that § 1361 is an appropriate basis for jurisdiction in an action challenging procedures used in administering social security benefits." *Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003) (citations omitted). The Supreme Court, however, has "on numerous occasions declined to decide whether the third sentence of § 405(h) bars mandamus jurisdiction over claims arising under the Social Security Act, either because we have determined that jurisdiction was otherwise available under § 405(g) . . . or because we have determined that the merits of the mandamus claim were clearly insubstantial." *Heckler v. Ringer*, 466 U.S. 602, 616, 104 S. Ct. 2013, 2022, 80 L. Ed. 2d 622 (1984). "Mandamus is an extraordinary remedy and is available to compel a federal official to perform a duty only if: (1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available." *Id.* (quotations and citations omitted).

Plaintiff urges that "[m]andamus . . . provides an independent, alternative basis for this Court's jurisdiction over the class members' claims." Pl.'s Reply (Doc. 39) at 24. Defendant observes that "[a] writ of mandamus is 'a drastic and extraordinary remedy reserved for really extraordinary causes.'" Def.'s Response (Doc. 38) at 37 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380, 124 S. Ct. 2576, 2586, 159 L. Ed. 2d 459 (2004). Defendant is circumspect that such a remedy exists in a case such as this. *Id.*

To the extent that the Court has found jurisdiction of the class pursuant to § 405(g), mandamus is inappropriate because the remedy under § 405(g) is adequate. *See Ringer*, 466 U.S. at 616, 104 S. Ct. at 2022. The Court lacks jurisdiction, however, over that portion of the class that has not yet presented claims. *See* Section IV.A., *supra*. It is untenable

that widows and widowers who have suffered the indignity of the denial of their fundamental right to marry while their beloved was still alive, must face continued marginalization of their relationship after their spouse's death. *See Obergefell v. Hodges*, — U.S. —, 135 S. Ct. 2584, 2606, 192 L. Ed. 2d 609 (2015). Such individuals should not have to continue to bear the uncertainty surrounding their entitlement to survivor's benefits based on unconstitutional laws. This case is an extraordinary case and those putative class members over whom § 405(g) does not confer jurisdiction deserve an extraordinary remedy. The putative class members, who have not yet presented their claims, meet the *Ringer* criteria—the individual's claim is clear and certain, the official's duty is nondiscretionary and plainly prescribed, and no other adequate remedy is available. *Heckler*, 466 U.S. at 616, 104 S. Ct. at 2022; *see also Leschniok v. Heckler*, 713 F.2d 520, 522 (9th Cir. 1983) (mandamus jurisdiction is appropriate for "challenges to the execution of constitutional duties."). Accordingly, the Court shall exercise mandamus jurisdiction over the putative class members who have yet to present their claim to the Administration.

### B.    Class Definition

Based upon the foregoing, the class definition shall include:

> All persons nationwide who (i) presented claims for and were denied, or will present claims for and be denied, social security spousal survivor's benefits based on not being married to a same-sex spouse for at least nine months at the time of the spouse's death and (ii) were prohibited by unconstitutional laws barring same-sex marriage from being married for at least nine months. This class is intended to exclude any putative class members in *Thornton v. Social Security Administration*, No. CV-18-01409-JLR-JRC (W.D. Wash.).

As discussed, *infra*, this definition meets the requirements of Rule 23, Federal Rules of Civil Procedure and in light of the unconstitutional nature of the statutory scheme, national application is appropriate.

### C.    Class Certification

"Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 131 S. Ct. 2541, 2548 (2011). "As the party seeking class certification, [Plaintiff] bears the burden of demonstrating the [he] has met

each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)."  *Zinser v. Accufix Research Inst., Inc.* 253 F.3d 1180, 1186 (9th Cir. 2001), *amended*, 273 F.3d 1266 (9th Cir. 2001) (citations omitted).  The prerequisites of Rule 23(a) are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).[10]  Prior to certifying a class, "the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.  *Zinser*, 253 F.3d at 1186 (citations omitted).  Further, the trial court's broad discretion to certify a class "must be exercised within the framework of Rule 23."  *Id.* (citations omitted).

## 1. Rule 23(a) Requirements

### a. Numerosity

A class fulfills the numerosity requirement where class members are "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Generally, 40 or more members will satisfy the numerosity requirement."  *Perez v. First American Title Ins. Co.*, 2009 WL 2486003, *2 (D. Ariz. Aug. 12, 2009) (citations omitted).  "The party seeking class certification need not identify the precise number of potential class members."  *Id.* (citations omitted).  "Plaintiff[] [is] not required to establish the precise number of class members, as long as common sense and reasonable inferences from the available facts show that the numerosity requirement is met."  *Lowe v. Maxwell & Morgan, PC*, 322 F.R.D. 393, 399 (D. Ariz. 2017) (citations omitted).

---

[10] The full text of Rule 23(a) is as follows:

(a) Prerequisites.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    (1) the class is so numerous that joinder of all members is impracticable;

    (2) there are questions of law or fact common to the class;

    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Defendants do not dispute Plaintiff's contention that the proposed class meets the numerosity requirement of Rule 23(a)(1).  Plaintiff has provided the declaration of Gary J. Gates, Ph.D., a retired Distinguished Scholar and Research Director at the Williams Institute at the University of California Los Angeles ("UCLA") School of Law.  *See* Pl.'s Opening Br. (Doc. 26), Gates Decl. (Doc. 26-4) at ¶ 3.  Most recently, Dr. Gates served as a senior researcher at Gallup.  *Id.*  Dr. Gates notes that "[a]vailable data do not allow for a direct estimate" of the number of individuals who were unable to be married for nine months prior to their spouse's death due to laws prohibiting same-sex marriage.  *Id.* at ¶ 12.  As such, Dr. Gates relied on the 2016 United States census Bureau's annual American Community Survey ("ACS") to identify same-sex couples who indicated that they married in 2015.[11]  *Id.*  Analyzing the data from each of the fourteen (14) states where same-sex marriage only became available after *Obergefell*, Dr. Gates utilized the number of same-sex couples reported in the 2010 Census, the number of same-sex couples who married in 2015, the death rate per 100,000 population, and the probability that exactly one spouse dies to estimate the number of surviving same-sex spouses after the death of a spouse.  *Id.* at ¶¶ 13–22.  Based on this analysis, Dr. Gates offers a conservative estimate of 405 individuals from these fourteen (14) states that would meet the class criteria.  Pl.'s Opening Br. (Doc. 26), Gates Decl. (Doc. 26-4) at ¶¶ 13, 21–22.  This calculation does not include the remaining thirty-six (36) states which legalized same-sex marriage prior to the *Obergefell* decision, such as Arizona.  *See id.* ¶ 13.  Therefore, Dr. Gates's estimate offers a minimum number of affected individuals.

The Court finds that Dr. Gates's methodology and calculation for approximating class size is reasonable.  Furthermore, the estimated number of individuals is sufficiently high to make joinder impracticable.  *See* Fed. R. Civ. P. 23(a)(1).  As such, Plaintiff has met his burden to demonstrate that the number of putative class members is sufficiently numerous.

---

[11] Dr. Gates notes that his choice of year was guided by the date of the *Obergefell* decision on June 26, 2015.  Pl.'s Opening Br. (Doc. 26), Gates Decl. (Doc. 26-4) at ¶ 12.

1

2   **b.  Commonality**

3   A class fulfills the commonality requirement where "there are questions of law or

4   fact common to the class[.]"  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff

5   to demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart Stores,*

6   *Inc. v. Dukes*, 564 U.S. 338, 349–50, 131 S. Ct. 2541, 2551 (2011) (citing *General*

7   *Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, 102 S. Ct. 2364, 2370, 72 L. Ed.

8   2d 740 (1982)).  The class members' claims "must depend upon a common contention . . .

9   capable of classwide resolution—which means that determination of its truth or falsity will

10  resolve an issue that is central to the validity of each one of the claims in one stroke."

11  *Dukes*, 564 U.S. at 350, 131 S. Ct. at 2551.  Moreover, "[t]he existence of shared legal

12  issues with divergent factual predicates is sufficient, as is a common core of salient facts

13  coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150

14  F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v.*

15  *Dukes*, 564 U.S. 338, 131 S. Ct. 2541 (2011).  "[I]n a civil rights suit, . . . commonality is

16  satisfied where the lawsuit challenges a system-wide practice or policy that affects all of

17  the putative class members."  *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001),

18  *overruled on other grounds by Johnson v. California*, 543 U.S. 499, 125 S. Ct. 1141, 160

19  L. Ed. 2d 949 (2005) (citations omitted).

20  Plaintiff identifies the denial of survivor's benefits to those widows and widowers

21  who could not meet the nine-month durational requirement due to their home state's

22  unconstitutional ban on same-sex marriage as the common issue for all putative class

23  members.  *See* Pl.'s Opening Br. (Doc. 26) at 42–43.  Defendant asserts that "[m]erely

24  alleging a 'violation of the same provision of law'"—here, the Constitution—'does not

25  satisfy commonality.'"  Def.'s Response (Doc. 38) at 40 (quoting *B.K. by next friend*

26  *Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019)) (alterations in original).

27  Here, the "class members do not merely allege a violation of the same law; they

28  challenged 'the constitutionality of [SSA's] policies and practices, which is a 'common

question of law or fact/ that can be litigated in 'one stroke.'"  Pl.'s Reply (Doc 39) at 25

(quoting *Tinsley*, 922 F.3d at 969) (alterations in original)).  The legal issue is the same for all class members.  "Although each claimant will have an individual case to be made to support his or her claim for survivor benefits, certifying the class will give each class member the opportunity to make that claim—something they have been unable to do in the past." Pl.'s Not. of Suppl. Authority (Doc. 40), *Thornton v. Comm'r of SSA*, Case No. CV-18-01409-JLR-JRC, Report and Recommendation at 31 (W.D. Wash. Jan. 31, 2020).  The Court finds the commonality prerequisite is satisfied.

### c.  Typicality

A class fulfills the typicality requirement where "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations omitted).  "[U]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Stanton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiff urges that his claims are typical to the class because he and the putative class members "have identical constitutional claims: in excluding them from eligibility for those benefits, SSA has deprived them all of equal protection and due process." Pl.'s Opening Br. (Doc. 26) at 45.  Plaintiff further observes that "[w]hen the challenged conduct is a policy or practice affecting all class members, the commonality and typicality inquiries are similar, but 'the typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class.'" Pl.'s Opening Br. (Doc. 26) at 44 (citing *Armstrong v. Davis*, 275 F.3d 849, 868–69 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005)).  Defendant argues that because Mr. Ely's claims and supporting documentation regarding his relationship with Mr. Taylor "are atypically favorable to this constitutional theory" his claims cannot be typical to the class.  Def.'s Response (Doc. 38) at 42.

1    Whether each individual class member is entitled to benefits will be determined at

2    the administrative level, but each individual has been, or would have been, denied

3    survivor's benefits based on their inability to meet the durational requirement due to same-

4    sex marriage bans.   This is Mr. Ely's situation and it is typical of the putative class

5    members.   The Court finds that the typicality prerequisite has been met.

6                          **d.  Adequacy**

7         The final prerequisite of for class certification is that "the representative parties will

8    fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To

9    determine whether the representation meets this standard, we ask two questions: (1) Do the

10   representative plaintiffs and their counsel have any conflicts of interest with other class

11   members, and (2) will the representative plaintiffs and their counsel prosecute the action

12   vigorously on behalf of the class?"  *Stanton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.

13   2003) (citations omitted).

14        There does not appear to be any conflicts of interest present in this case.  Moreover,

15   Plaintiff's counsel have a demonstrated extensive experience in representing same-sex

16   couples in obtaining access to the benefits and protections related to marriage, as well as

17   social security.  *See* Pl.'s Opening Br. (Doc. 26), Renn Decl. (Doc. 26-5) & Clymer Decl.

18   (Doc. 26-6).  The Court finds the adequacy prerequisite is satisfied.  Defendant does not

19   contest this issue.

20                     **2.  Rule 23(b)(2) Requirements**

21        "A class action may be maintained if Rule 23(a) is satisfied and if . . . (2) the party

22   opposing the class has acted or refused to act on grounds that apply generally to the class,

23   so that final injunctive relief or corresponding declaratory relief is appropriate respecting

24   the class as a whole."  Fed. R. Civ. P. 23(b).  "The key to the (b)(2) class is the indivisible

25   nature of the injunctive or declaratory remedy warranted—the notion that the conduct is

26   such that it can be enjoined or declared unlawful only as to all of the class members or as

27   to none of them."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S. Ct. 2541, 2557

28   (2011).  "The rule does not require us to examine the viability of bases or class members'

claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). "[I]t is sufficient to meet the requirements of Rule 23(b)(2) that class members complain of a pattern or practice that is generally applicable to the class as a whole." *Id.* (quotations and citations omitted).

Plaintiff asserts that Plaintiff and all putative class members "have suffered or will suffer a violation of their rights to equal protection and due process as a result of SSA's denial of equal access to survivor's benefits." Pl.'s Opening Br. (Doc. 26) at 46. Defendant counters that "every absent class member will still need to go through additional, individualized litigation" which is inconsistent with a single injunction. Def.'s Response (Doc. 38) at 43. Here, the Court is not being asked to make further individualized determinations. Rather, determinations regarding a specific surviving spouse's entitlement to benefits will be determined by the agency when it complies with the injunction. *See Johnson v. Shalala*, 2 F.3d 918, 921 (9th Cir. 1993) ("class certification order require[d] that the Secretary readjudicate those claims that were denied under the [invalidated] policy[,] [and] [s]ome claimants will receive benefits they were once denied . . . [and] [f]or others, the readjudication will make no difference"). The Court finds that each class member has been burdened by the same constitutional violations and as such, injunctive and declaratory relief for the class as a whole is appropriate. Certification pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure is also proper.

### D.  *National Injunctive Relief*

"Nothing in Rule 23 . . . limits the geographical scope of a class action that is brought in conformity with that Rule." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979). Moreover, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Id.* (citations omitted). "If a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than

1    necessary to redress the complaining parties." *Id.* "To permit such broad injunctions as a

2    general rule, [however,] without an articulated connection to a plaintiff's particular harm,

3    would unnecessarily stymie novel legal challenges and robust debate arising in different

4    judicial districts." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir.

5    2019).

6         Here, "[i]t is unlikely that differences in the factual background of each claim will

7    affect the outcome of the legal issue." *Yamasaki*, 442 U.S. at 701, 99 S. Ct. at 2557.

8    Furthermore, "the class-action device saves the resources of both the courts and the parties

9    by permitting an issue . . . to be litigated in an economical fashion under Rule 23." *Id.* In

10   this case, the class definition has been narrowed to specifically exclude the *Thornton*

11   plaintiffs and putative class members.  Furthermore, the Social Security Act applies with

12   equal force across all jurisdictions.  To require putative class members to litigate the

13   constitutionality of the duration-of-marriage requirement as it applies to same-sex couples

14   who were barred from marriage risks inconsistent rulings which would result in fractured

15   Social Security regulations.  The Court finds that national injunctive relief is appropriate

16   for a consistent national policy and the most economical use of the resources of the courts

17   and the parties.

18        **E.    Appointment of Class Counsel**

19        "Unless a statute provides otherwise, a court that certifies a class must appoint class

20   counsel." Fed. R. Civ. P. 23(g)(1).  The Court must consider: "(i) the work counsel has

21   done in identifying or investigating potential claims in the action; (ii) counsel's experience

22   in handling class actions, other complex litigation, and the types of claims asserted in the

23   action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel

24   will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

25        Plaintiff indicates that Lambda Legal, the office of Brian Clymer, Attorney at Law,

26   and Menard Disability Law (collectively "Plaintiff's Counsel") seek to serve jointly as

27   counsel for the Class.  Pl.'s Opening Br. (Doc. 26) at 47.  Plaintiff's Counsel have worked

28   with Mr. Ely for three (3) years and assisted him in the navigation of the administrative

1  proceedings, as well as the instant case. *Id.* Additionally, Plaintiff's Counsel has continued

2  to monitor and evaluate the claims and administrative appeals of other putative class

3  members. *See* Pl.'s Opening Br. (Doc. 26), Renn Decl. (Doc. 26-5) at ¶¶ 2–4 & Clymer

4  Decl. (Doc. 26-6) at ¶ 2. Moreover, Plaintiff's counsel have a demonstrated extensive

5  experience in representing same-sex couples in obtaining access to the benefits and

6  protections related to marriage, as well as social security and class actions. *See id.*, Renn

7  Decl. (Doc. 26-5) & Clymer Decl. (Doc. 26-6). Plaintiff's Counsel have dedicated

8  appropriate staffing and materials to this litigation and are committed to continuing to do

9  so. Pl.'s Opening Br. (Doc. 26) at 48. The Court finds that Plaintiff's Counsel fully satisfy

10  the requirements for class counsel and will appoint them as such.

11

12  **V.      CONCLUSION**

13       Based upon the foregoing, IT IS HEREBY ORDERED that:

14       1)      Plaintiff's Opening Brief (Doc. 26) is GRANTED;

15       2)      The Class shall be certified pursuant to Rule 23(a) and (b)(2), Federal Rules

16  of Civil Procedure, and is defined as follows:

17              All persons nationwide who (i) presented claims for and were denied,
18              or will present claims for and be denied, social security spousal
                survivor's benefits based on not being married to a same-sex spouse
19              for at least nine months at the time of the spouse's death and (ii) were
                prohibited by unconstitutional laws barring same-sex marriage from
20              being married for at least nine months. This class is intended to
                exclude any putative class members in *Thornton v. Social Security*
21              *Administration*, No. CV-18-01409-JLR-JRC (W.D. Wash.).

22       3)      Plaintiff Michael Ely is designated the class representative;

23
         4)      Defendant is ENJOINED from denying class members benefits without
24
    consideration of whether survivors of same-sex couples who were prohibited by
25
    unconstitutional laws barring same-sex marriage from being married for at least nine
26
    months would otherwise qualify for survivor's benefits;
27
         5)      Lambda Legal, the Office of Brian Clymer, Attorney at Law, and Menard
28
    Disability Law are appointed as class counsel pursuant to Rule 23(g), Federal Rules of

Civil Procedure;

6)      As to Mr. Michael Ely, personally, the Commissioner's decision is REVERSED and REMANDED for calculation and award of benefits.  42 U.S.C. § 405(g); and

7)      The Clerk of the Court shall enter judgment in favor of Plaintiff Ely and the Class and close its file in this case.

Dated this 26th day of May, 2020.

Honorable Bruce G. Macdonald
United States Magistrate Judge